**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: March 31, 2010**

_____
JOHN C. AKARD
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRCT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 07-11545-CAG |
| | § | |
| MICHAEL PATRICK KELLY, | § | CHAPTER 7 |
|     Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| MARK BAXTER and | § | |
| BAXTER FAMILY TRUST, | § | |
|     Plaintiffs, | § | |
| | § | ADV. NO. 08-01028- CAG |
| v. | § | |
| | § | |
| MICHAEL PATRICK KELLY, | § | |
|     Defendant. | § | |
| | § | |

**MEMORANDUM OF OPINION AND ORDER
DENYING OBJECTION TO THE DISCHARGEABILITY OF A DEBT**

    Mark Baxter and the Baxter Family Trust (the "Plaintiffs") seek a judgment against Michael Patrick Kelly (the "Debtor" in the captioned Bankruptcy case and the "Defendant" in this Adversary Proceeding) and to have the judgment declared not discharged in the Debtor's

Bankruptcy case.[1]  The Plaintiffs rely on several subsections of § 523(a) of the Bankruptcy Code.[2]

## FACTS

Sometime in the early 2000s (the evidence does not reflect exact dates), the Debtor retired from 26 years in the electronics industry and was looking for a new line of endeavor. He was introduced to Paul Pederson and Todd Lynch, who were in the home building business. The three of them decided to form Primera Homes Ltd. ("Primera") for the development of residential property and the construction of homes. The Debtor, Pederson and Lynch were the original limited partners, but eventually there were several other limited partners, including Mark Baxter. The Debtor owned over 50% of the limited partnership interest, Pederson and Lynch each owned 5%. The Debtor's father apparently was a 10% limited partner.

The general partner of Primera was a corporation known as KLP Homes, Inc., in which the Debtor, Pederson and Lynch were the officers and shareholders.[3]

The Debtor acknowledged that he had no prior experience in the home building business. He testified that he handled the publicity, sales, and relationships with title companies, while Pederson and Lynch looked after the development of the property and the construction of houses.

The Plaintiffs in this Adversary Proceeding are Mark Baxter and a family trust, which he and his wife established. He is the trustee of the trust. Mr. Baxter has extensive experience in the financial services business, including selling fixed income securities for a major brokerage firm. He and his wife reside in Japan. Mr. Baxter makes periodic visits to the United States. He was introduced to the Debtor and to Primera by a mutual friend, who was also an investor in the limited partnership. On May 25, 2003, Mr. Baxter acquired a 5% interest in the limited partnership for $130,000 [Plaintiffs' Exhibit 1].

The principal project of Primera was to develop a parcel of raw land in the hills near Austin, Texas into a residential subdivision known as Maravilla. Apparently started in 2003 or early 2004, the project met with initial good public acceptance. In a "Primera Homes Partners'

---

[1] This court has jurisdiction in this matter under 28 U.S.C. § 1334 (a) and (b), 28 U.S.C. § 157(a) and (b), and the Order of Reference of Bankruptcy Cases and Proceedings by the United States District Court for the Western District of Texas, August 13, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(1) and (2)(I). This court may enter a final judgment; including, if appropriate, a monetary judgment in this matter. *Morrison v. Western Builders of Amarillo,* 555 F.3d 473 (2009).

[2] The Bankruptcy Code is 11 U.S.C. § 101 *et. seq.* References to section numbers are references to the Bankruptcy Code.

[3] A review of the Bankruptcy Court records for the Western District of Texas does not reveal a bankruptcy filing by KLP Homes, Inc. nor by Primera Homes Ltd. A Chapter 7 liquidation bankruptcy was filed by Primera Homes Corporation on June 21, 2007. A cursory examination of the schedules indicates that the assets and liabilities attributed to that corporation are the assets and liabilities of Primera Homes Ltd. and/or KLP Homes, Inc. The schedules of Primera Homes Corporation state that it has assets of $1,290,428.20 and liabilities of $7,544.817.46. The listing of the largest shareholders states that the Debtor owns 55% of the stock, Ralph Kelly 10%, Pederson 5%, Lynch 5%, and James Sandlin 5%. The Debtor is the President, Secretary, and Treasurer of the corporation. Pederson and Lynch are Vice-Presidents. Testimony at this hearing shows that Ralph Kelly is the Debtor's father and James Sandlin is his brother-in-law.

Report" dated May 30, 2004 [Plaintiff's Exhibit 2] (the "Partners' Report"), the Debtor described what he felt were good prospects for Maravilla and the partnership. The spreadsheet attached to that report was not introduced into evidence. Of particular interest are two paragraphs on page two of the report which state:

> Many of you have asked me how much and when we will all start seeing distributions. The spreadsheets included with this report will answer those questions in detail, but the summary version is I am looking to distribute $6.5MM before next March, the bulk of which will be before Christmas this year, if we keep on our current schedule.
>
> We do have some additional capital requirements and those are detailed in the document titled "Use of Proceeds." I need to raise $740K in bridge financing to cover our current requirements, but this is low-risk money. I need it to either buy land, which our customers will then buy from us as we get their construction loans done, or I need to put it into an escrow account, so that we can post fiscal with the City. I have already raised $200K of this amount from an outside party. I am offering a pretty decent return – 15% for a six month loan – 20% for a nine month loan – along with very little risk. So let me know if you can participate ASAP. There is no time to drag this out. I have other outside entities that I can go to if need be, but you all have right of first refusal, so a quick "yes" or "no" would be appreciated.

The Use of Proceeds document [Plaintiff's Exhibit 3] ( the "Use of Proceeds") mentioned in the Partners' Report outlined three needs for cash:

1. To Acquire Lot 1 of Cardinal Hills Unit 14. Among other statements, the Use of Proceeds said: "Acquiring this lot will allow the creation of a drainage easement which is the final remaining hurdle to receiving the permit from the City of Austin to complete the development. **Cost: $55,000. Actual Value: $40,000. Timeframe: Immediate (1st week in June)."**

2. The acquisition of 78 lots from Cardinal Hills Joint Venture. After describing the proposed acquisition, the Use of Proceeds said: "**Cost: $285,000. Actual Current Value: $250,000.00. Actual Value when development is complete: $675,000.00. Timeframe: Prior to July 1, 2004."**

3. "Prior to commencing development of the roads and drainage at Maravilla, Primera is required to post fiscal with the City of Austin. Unfortunately, Primera was initially misinformed as to what this constituted and did not perceive it being an issue until recently. Primera is required to post a Surety Bond or provide an Irrevocable Letter of Credit ("LOC") with the City in the amount of the project under their jurisdiction. This amount is $800,000. Travis County, Water District #17 and Austin Energy are the other entities whose jurisdiction covers the other $500,000 of the project. They do not require a bond to be posted or a letter of credit. To obtain the Bond or LOC, Primera's understanding is that we will need somewhere between 50-100% of the amount in an

3

escrow account, depending upon our current financial strength. While we do not have sufficient capital to fund this need or those noted above, Primera does have sufficient capital and revenue to fund all operating expenses and the cost of development as the project is completed. Therefore, Primera believes that posting 50% of this amount in an escrow account will allow us to obtain the necessary Bond or LOC to satisfy this requirement. **Cost: $400,000.00. Actual Value: $400,000.00. Timeframe: Prior to July 15th at the absolute latest.**"

(Emphasis as in the Use of Proceeds)

The concluding paragraph of the Use of Proceeds stated in bold type:

"As can be seen, all funds obtained have an underlying asset value or will reside in an escrow account that protects the investors' capital. No financing shall be used to cover operational expenses, as this is not required. Primera has made available a Promissory Note and a Profits Interest component to compensate the investor(s) interested in participating. Please review those documents for the specifics of the offering. Please contact Michael Kelly at 512-917-5165 if you have any questions. Thank you for your attention to this matter."

The proposed promissory note and profits interest document were not introduced into evidence.

The Baxter Family Trust loaned $400,000 to Primera. The debt was represented by the "18% PROMISSORY NOTE" dated June 03, 2004 in which the partnership agreed to pay that amount to the trust on June 03, 2005 with 18% interest [Plaintiff's Exhibit 4] (the "Note"). There is no mention of the loan proceeds being placed in escrow and the Note provides: "This Note is made without security or collateral and without recourse to the limited partners of the Maker."

Scant evidence was produced concerning the negotiations which lead to the Note. Mr. Kelly admitted that he had said at a deposition that he could not remember telling Mr. Baxter that the proceeds of the loan would not be placed in escrow, but rather used to construct the roads and utilities in Maravilla. At trial, he "remembered" doing that. Mr. Baxter testified that he did not understand that the $400,000 would be used to pay the contractors. There was no evidence to explain why, if an escrow was intended, it was not mentioned in the Note. There was no evidence to explain the differences in the terms offered in the Partners' Report and the terms of the note (interest rate, term, and the statement that the Note was unsecured).

Mr. Kelly testified that Mr. Baxter never made any complaint about the $400,000 not being placed in escrow or questioned Mr. Kelly about the escrow, until this adversary proceeding was filed. Mr. Baxter's attorney suggested in argument that there was no reason to fuss about the money not being placed in escrow after Mr. Baxter learned it was not in escrow, but the evidence does not reveal when Mr. Baxter learned that the money was not in escrow nor is there any direct evidence that Mr. Baxter expected the funds to be placed in escrow.

4

Mr. Kelly testified that the references in the Partners' Report to the City of Austin were in error. The property is outside the city limits and he said the requirements were those of Travis County.

Mr. Baxter participated in an "Investor Program" offered by Primera. Under that program, investors agreed to finance the construction of a house on a lot owned by Primera. The partnership constructed the home and was paid for that work from the loan proceeds. When the house was sold, the investor and the partnership split the profits. The evidence does show when Mr. Baxter commenced participation in this program, but, after some delay, the house in which Mr. Baxter was an investor was sold in July or August 2007 [Debtor's Exhibit 30].

Mr. Baxter stated that he made other loans to the partnership. He sold his partnership interest back to the partnership and did not get fully paid for that. Those items are not the subject of this adversary proceeding.

James Sandlin, Mr. Kelly's brother-in-law, is an attorney who worked on corporate and partnership matters with Mr. Kelly. Primera Homes placed money with Mr. Sandlin to be held in escrow pending its use by the business. Mr. Sandlin could not recall specifically if the $400,000 proceeds of the note mentioned above were placed in his escrow account. He recalled that at one time he had as much as $800,000 in the escrow account. When the engineer for Primera Homes Ltd. instructed him to do so, Mr. Sandlin wrote checks out of the escrow to contractors and suppliers. Mr. Sandlin did not present an accounting of the escrow account, so there was no information as to the dates, details, or amounts of the transactions with respect to the account. He implied that the account had been exhausted.

Unfortunately, sales at Maravilla fell off and by 2005 troubles of various kinds began to occur. The business continued to deteriorate.

Debtor's exhibits 1 through 80 are a series of E-mails between Mr. Baxter and Mr. Kelly between January 2005 and August 2007. Mr. Kelly testified that he did not have the prior E-mails between the parties because he changed computer systems and he could not retrieve the prior E-mails. Just as in the Partners' Report, the E-mails are full of optimistic predictions and expectations that forthcoming sales will result in full payment to Mr. Baxter and a large profit to all of the partners. Obviously, Mr. Kelly was optimistic. It is difficult to ascertain whether this optimism was based on (1) Mr. Kelly's lack of experience in the real estate development and construction business, (2) a desire to keep creditors and investors at bay while he hoped that things would eventually work out, or (3) an attempt to defraud the creditors and investors. There is no evidence to establish whether the numerous stumbling blocks and delays described by Mr. Kelly were real and, if so, the causes for them. There are indications of spasmodic partial payments to Mr. Baxter.

Mr. Kelly asserts that he lost $2.5 million in the housing venture (Debtor's Exhibit 80) and he testified that his father lost $1 million.

Mr. Kelly filed for relief under Chapter 7 of the Bankruptcy Code on August 23, 2007. His schedules listed a large number of creditors with nothing owed to them and the notation that

5

the debts were debts of "Primera Homes" without indicating whether it was the limited partnership or the corporation. It is a common practice, when the principal of a business files for bankruptcy, to list as creditors, all of the creditors of the business. The purpose is to discharge any potential personal liability on the business debts. Undoubtedly, that listing brought forth this adversary proceeding to establish personal liability on the part of Mr. Kelly for debts the business owed to the Plaintiffs.

Plaintiffs' Exhibit 5 is a copy of their Proof of Claim filed in Mr. Kelly's bankruptcy case. The claim is for $784,170 and is composed of the following:

1. On a $200,000 note relating to a Subscription Agreement for Securities of Primera Homes, Ltd and a Profits Interest Agreement:

    a. Outstanding Principal Balance on Note:   $ 67,220.00
    b. Unpaid Interest as of Bankruptcy Filing      21,665.00
    c. Unpaid Profits Interest                      36,000.00
       Total                                     $ 124,885.00

2. On the $400,000 Note:

    a. Outstanding Principal Balance on the Note  $ 400,000.00
    b. Unpaid Interest as of Bankruptcy Filing       227,285.00
    c. Unpaid Profits Interest                        32,000.00
       Total                                      $659,285.00

No documents supporting the claim are included in Exhibit 5. The exhibit is the same as claim No. 42 on the court's claim docket. No supporting documents are attached to the filed claim. The Plaintiffs also filed claim No. 43 for the "Sale of Ltd. Partnership Interest" in the amount of $104,858, but that matter is not the subject of this adversary proceeding.

## DISCUSSION

The Baxter Family Trust[4] seeks to have the debt it declared nondischargeable in Mr. Kelly's bankruptcy case under several subsections of § 523(a) of the Bankruptcy Code. The Plaintiffs must prove by a preponderance of the evidence that the debt is nondischargeable. *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.CT. 654, 659, 112 L.Ed.2d 755 (1991).

**Section 523(a)(6)** denies the discharge for any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." There is no evidence in this case that the debtor committed willful and malicious injury to anyone or anyone's property.

**Section 523(a)(4)** denies the discharge for any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

---

[4] The pleadings and the evidence do not relate to any debt owed to Mr. Baxter, individually.

>Since its appearance in the Act of 1841, the qualification that the debtor be acting in a fiduciary capacity has consistently been limited in its application to what may be described as technical or express trusts, and not to trusts *ex maleficio* that may be imposed because of the very act of wrongdoing out of which the contested debt arose. The trust relationship must predate and exist apart from the act from which the underlying indebtedness arose

4 COLLIER ON BANKRUPTCY, § 523.10[1][d] (16th Ed. 2009). No evidence was introduced to establish that Mr. Kelly was the trustee.

**Embezzlement is** "[t]he fraudulent taking of persons property with which one has been entrusted, esp., as a fiduciary." BLACK'S LAW DICTIONARY 599 (9th Ed..2004). There is no evidence that Mr. Kelly took any property which had been entrusted to him.

**Larceny** is "[t]he unlawful taking and carrying away of someone else's personal property with the intent to deprive the possessor of it permanently." BLACK'S LAW DICTIONARY 959 (9th Ed. 2004). There is no evidence that Mr. Kelly took possession of or carried away someone else's personal property.

**Section 523(a)(2)(B)** denies the discharge of a debt "for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by . . . the use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition, (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive."

No financial statements were introduced into evidence; thus there is no basis for an objection discharge under this section. The Plaintiffs rely heavily on the recent decision of *Morrison v. Western Builders of Amarillo (In re Morrison),* 555 F.3d 473 (5th Cir. 2009). Reliance on that case is misplaced, because Morrison gave a false statement of the financial condition of his closely held company to Western Builders, knowing that Western Builders was going to rely on the statement in awarding a contract to Morrison's company. In the present case, there is no evidence that Mr. Kelly gave any statements of his financial condition or the financial condition of Primera to the Plaintiffs.

**Section 523(a)(2)(A)** denies the discharge of any debt "for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insiders' financial condition."

The Plaintiffs' claims focus on the Partners' Report, the Use of Proceeds and the Note. They seek to have the principal of the Note plus 18% interest from the date of the Note declared not discharged and a personal obligation of Mr. Kelly.[5] They argue that the $400,000 should

---

[5] Only individuals receive a discharge in a Chapter 7 proceeding (§ 727(a)(1)), so there is no issue in this proceeding whether Primera Homes Ltd. (the maker of the note) is discharged from that obligation.

7

have been placed in an escrow account and not used for the business purposes of Primera. Their conclusion is that if the escrow had been maintained, the money would have been there to pay back the principal, if not the interest, on the note.

**Property**. "Most courts have held that it is not necessary that the property actually be gained for the direct benefit of the debtor. Even and indirect benefit to the debtor may constitute 'obtaining property' within the meaning of section 523(a)(2)(A)." 4 COLLIER ON BANKRUPTCY, § 52308[1][a] (16th Ed. 2009). Considering Mr. Kelly's large percentage ownership of Primera and the related entities, the $400,000 would be an indirect benefit to him.

**False pretenses or false representations.** In order for a debtor's representation to be a false pretense or a false representation, it must have been (1) a knowing and fraudulent falsehood, (2) describing past or current facts, and (3) relied upon by the other party. *RecoverEdge, L.P. v. Pentecost,* 44 F.3d 1284, 1292-3 (5th Cir 1995). It should be noted that § 523(a)(2)(A) does not statutorily require reasonable reliance as is required by § 523(a)(2)(B); however, the courts have stated that the statute "requires justifiable, but not reasonable, reliance." *Field v. Mans,* 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed. 2d 351 (1995).

The statements in the Partners' Report and in the Use of Proceeds, concerning the funds to be borrowed, were statements of intent, not statements of past or current facts. Consequently, those statements are not a false pretense or a false representation under this portion of the statute.

**Actual fraud.** In order to prove nondischargeability under the actual fraud theory, the objecting creditor must prove that (1) the debtor made representations, (2) at the time the debtor knew they were made the debtor knew they were false, (3) the debtor made the representations with the intention and purpose to deceive the creditor, (4) the creditor relied on such representations, and (5) the creditor sustained losses as a proximate result of the representations. *RecoverEdge,* 44 F.3d at 1293.

In this case, Mr. Kelly made the representations in the Partners' Report and in the Use of Proceeds and The Baxter Family Trust sustained a loss. Thus two of the five elements necessary for a recovery under this portion of the statute have been satisfied.

The crux of the representation is in the last paragraph of the Use of Funds which states: "As can be seen, all funds obtained have an underlying asset value or will reside in an escrow account that protects the investors' capital. No financing shall be used to cover operational expenses, as this is not required." The questions are: was that a false statement of Mr. Kelly's intent and did he make the representations with intent to deceive Mr. Baxter? Understandably, there is no direct evidence on these points. The only way we can determine these matters is by looking at his testimony and his actions. At trial he stated that he "remembered" telling Mr. Baxter that the $400,000 would not be put in escrow before Mr. Baxter put up the money. This statement contradicted his testimony on deposition. He put a large amount of money (exceeding $400,000) in an escrow account with Mr. Sandlin, but it is not clear that the money put in escrow was the $400,000 from the Baxter Family Trust. He apparently permitted the money in escrow to be used for construction as directed by Primera's engineer. Did he intend that use when he wrote the Partners' Report? If so, he made a misrepresentation which constitutes fraud. On the

8

other hand, "[a] debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions." 4 COLLIER ON BANKRUPTCY, § 523.08[1][d] (16th Ed. 2009). On balance, the Plaintiffs have not carried their burden of proof by a preponderance of the evidence that Mr. Kelly made those statements with intent to deceive Mr. Baxter and with the knowledge that he had no intent to carry them out.

Did Mr. Baxter (and thus the Baxter Family Trust) rely on Mr. Kelly's representations? He testified that he did not expect the $400,000 to be used for construction, but he did not say what he expected Primera to do with that money. In this case, actions speak louder than words. Mr. Baxter's actions show that he did not expect the $400,000 to be placed in escrow:

(1) The provisions of the Note varied in major respects – term and interest rate – from those described in the Partner's Report.

(2) There is no mention in the Note of the funds being held in escrow.

(3) There is no other document stating that the $400,000 proceeds of the Note would be held in escrow.

(4) The Note specifically stated that it was "made without security or collateral."

(5) The Note matured in June 2005. Debtor's Exhibits 1 through 80 are a series of E-mails between Mr. Baxter and Mr. Kelly from January 2005 through August 2007. The court found no mention of the escrow in those E-mails.

(6) Mr. Kelly testified that Mr. Baxter made no mention of the escrow until this adversary proceeding was filed.

In argument, Mr. Baxter's attorney forcefully pointed out that time and again Mr. Kelly made predictions which did not come true. To say that Mr. Kelly was optimistic would be an understatement. On the other hand, Mr. Baxter is experienced in the matters of finance and he knows, perhaps better than the general public, that predictions are just forward looking statements which cannot be relied upon. There are a number of forward looking statements in the Partners' Report, but most of the statements to which counsel referred occurred after the date of the Note and are contained in the Debtor's exhibits.

The Plaintiffs have not carried their burden of proving by a preponderance of the evidence that Mr. Baxter relied on a representation that the proceeds of the note would be placed in escrow.

### CONCLUSION AND ORDER

The court concludes that the Plaintiffs have not proved by a preponderance of the evidence that the claim of the Baxter Family Trust on the Note should be excepted from Mr. Kelly's discharge.

It is therefore **ORDERED** that the Plaintiff's complaint is, in all things, DENIED.

+

# # # #